Filed 12/11/25  P. v. Aleo CA5
(Opinion on transfer from Supreme Court)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>FRANK JOSEPH ALEO,<br><br>Defendant and Appellant. | F084511<br><br>(Super. Ct. No. CR-19-002757)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ricardo Córdova, Judge.

Jake Stebner and William W. Lee, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, Michael P. Farrell and Kimberley A. Donohue, Assistant Attorneys General, Louis M. Vasquez, Christina H. Simpson, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Hill, P. J., Detjen, J. and Peña, J.

## INTRODUCTION

A jury convicted defendant Frank Joseph Aleo (defendant) of multiple offenses, including first degree murder in 1983 based upon his involvement in an armed robbery and burglary during which a victim was shot and killed. After the passage of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill No. 1437), defendant filed a Penal Code section 1172.6 (formerly § 1170.95) petition for resentencing, which the trial court denied without issuing an order to show cause or holding an evidentiary hearing. (Undesignated statutory references are to the Penal Code.) We previously reversed the court's order denying the petition at the prima facie stage and remanded the matter for the court to issue an order to show cause and to hold an evidentiary hearing. Following an evidentiary hearing, the court again denied defendant's petition, concluding defendant was a major participant in the underlying felony who acted with reckless indifference to human life and, thus, ineligible for relief.

Defendant appealed from the order denying his section 1172.6 petition after the evidentiary hearing, arguing insufficient evidence supported the trial court's findings, and the trial court prejudicially erred in considering his statements in parole eligibility hearings at the evidentiary hearing. We previously affirmed the court's order in an unpublished decision. Thereafter, the California Supreme Court granted defendant's petition for review and transferred the matter back to our court with directions to vacate our previous decision and reconsider the cause in light of *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*).

After reconsidering our decision, we again affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant and Frank Lee Ford (Ford) were charged with the murder of Dixon Flinders on June 6, 1982, during the commission of a burglary and robbery (count I). The information alleged defendant was armed with a firearm during the commission of the

2.

murder in violation of section 12022, subdivision (a), and Ford personally used a firearm in violation of section 12022.5. Both defendant and Ford were also charged with feloniously and by means of force and fear taking personal property from the person, possession, and immediate presence of S.P. (count II). The information alleged defendant was armed with a firearm during the commission of the robbery charged in count II in violation of section 12022, subdivision (a) and Ford personally used a firearm during the commission of the robbery in violation of section 12022.5. Finally, defendant and Ford were charged with burglarizing Flinders's and S.P.'s house (count III). Again, the information alleged defendant was armed with a firearm during the commission of the burglary and Ford personally used a firearm during the commission in violation of section 12022.5. A jury convicted defendant and Ford of the charged counts and found true the additional allegations.

**TRIAL EVIDENCE**

### Prosecution Evidence

S.P. testified at trial that she heard banging on the door of her home at a quarter to 11:00 on the night of June 6, 1982. Flinders was next to her in bed and he got up and reached for his rifle. Flinders was lifting his rifle up and was in the bedroom doorway when S.P. heard a "pop." Flinders fell to his side; he told S.P. he "was shot" and to put her head down. Someone rushed in and told S.P. to cover her head or she was dead. The person asked her "where the money was and where the dope was" and said, " 'I just shot your old man, I'll shoot you, too.' " S.P. was crying, saying she had babies, and there was nothing there. When they left, S.P. called law enforcement. The next day, she noticed her purse and a cassette stereo were missing. She stated she had known Benson Neal for close to a year; he would "purchas[e] pot" from Flinders.

Judy H. testified at trial that Benson Neal was like a stepfather to her; he was her mother's boyfriend. She was with Neal at Sharon and Bill Poma's house in the evening

3.

of June 6, 1982.  Defendant, his wife, Ford, and Ford's girlfriend Elaine arrived.  Ford and defendant sat in the kitchen with Neal and another man.  Sharon Poma and Elaine were also in the kitchen.  They sat around the table and had a conversation.  Defendant said they were "supposed to go over and get some weed . . . , cop some of it."  Neal said Dixon Flinders was "scary."  Judy H. had reported to Detective Fred Vaughn that it sounded like they were discussing a robbery; however, at trial, she denied hearing anyone say they were going to rob anybody.  Judy H. stated she told Detective Vaughn "what it seemed like he wanted to hear."  She specifically denied that defendant said anything to anyone about leaving and going to commit a robbery.  On redirect examination at trial, Judy H. stated it "sorta" sounded like they were planning a robbery but "not really."

She testified defendant was talking about needing to get money and Neal was saying where he could "cop some weed."  She testified "cop" meant "buy."  She testified defendant said he had a gun.  At some point, defendant, Ford, Neal, Sharon Poma, and the "other guy" left for 45 minutes to an hour.  When they came back, Neal had a tape recorder wrapped in a pillowcase.  Ford was upset and crying.

Detective Vaughn testified he had three taped conversations with Judy H.  Judy H. told him there was a discussion at the kitchen table regarding guns and about Dixon Flinders having weed and being a "pushover."  She reported that defendant "was talking about getting some money" and Neal responded they could get some weed from Flinders. Neal said Flinders was "kinda scary."  Judy H. denied to Vaughn that there was any discussion of a gun but also stated they said there was a gun in defendant's car.  She also reported, " 'Frank [Aleo] said something about the gun' " and it sounded like they were talking about a robbery.  Vaughn testified he also spoke to Jesse I., who was at the Pomas' house that evening.  Jesse I. stated he heard Neal tell Sharon she would have to go up to the door and knock, but Jesse I. did not hear a "robbery" mentioned.  Jesse I. also reported Neal told him they were going to rob Dixon Flinders and defendant told Neal to "shut up."

4.

Jeanette H. testified she and her fiancé Charles Bryant, Neal's stepbrother, were at home that night when Neal came home after being gone with Judy H. for an hour. Neal asked Bryant for a gun; he did not indicate why he wanted it. Bryant got the handgun and gave it to Neal and Neal left. Jeanette H. admitted that she previously lied under oath when she testified that she did not hear anything about a gun that night. Bryant also testified he gave Neal his .22-caliber short-barrel handgun that night because Neal asked for it; the gun was fully loaded with five rounds of ammunition. Neal walked out with it and Bryant did not see him again until he came back with Judy H. at around 11:00 p.m.

Jesse I. testified he was at the Poma residence the evening of June 6, 1982. At some point, Neal, Ford, Sharon Poma, and defendant were going out and he asked them for a ride home. In the car, Neal started to say something to Jesse I. but defendant told Neal to " 'shut up' " or " 'don't say it.' "

William (or Bill) Poma testified his wife Sharon, defendant, Ford, Neal, and Ford's girlfriend Elaine Spears were sitting around the kitchen table at his home that night. William was sitting on the couch in the adjacent living room and could hear parts of their conversation. The group was getting ready to go to the store when Neal arrived and asked if they had any "pot." William responded "no," and Neal said he "knew where he could get some"; he mentioned "good old Dixon." Neal was "talking funny," "in riddles," about Dixon. William heard Neal say something concerning a robbery. At trial, William denied hearing defendant say anything about a robbery or "pulling a job," though he previously testified as such. After being presented with his prior sworn statements, William recalled Neal mentioned a gun; Neal had stated they did not need a gun because Flinders was a "pushover." He previously testified that defendant felt a weapon was necessary, but stated at trial that he did not "believe that is true now." Shortly after that, Sharon, Neal, defendant, Ford, and Jesse I. left to buy beer. William told Sharon not to go, but she went anyway. She wore a wig because she did not want to be identified. They all came back about two hours later except for Jesse I. Someone was

5.

carrying a black purse and a white pillowcase. Defendant and Sharon went through the purse. William and Sharon eventually burned the purse at defendant's direction. At some point, William saw defendant with money and he heard him say he was going to give it to Ford. Ford was upset and crying when he came in. Everyone left the Pomas' house about a half hour later. After they left, William went to the garage and saw a rifle that did not belong to him; he had seen Neal taking it out of a car. William threw it away.

Sharon Poma testified Neal came over that night and asked defendant if he wanted to buy marijuana. Defendant said he did not have money and Neal started talking about his friend Dixon Flinders who owed him money or weed. Neal discussed robbing Flinders and "[s]omething was said about a gun." Defendant "said that there shouldn't be any guns . . . , he didn't like the idea of that; talking about that." Sharon testified she gave defendant $60 to purchase weed. Sharon previously testified defendant and Ford joined in the plan to rob Flinders; however, she stated they "didn't plan to go rob nobody," and she previously testified untruthfully because she "was under threats" by "[p]eople on Benson Neal's side."[1] She was also presented with her prior testimony from Neal's trial during which she stated defendant asked Neal if he would need a gun and Neal said "no" because Flinders was a "pushover." She also previously testified defendant said they should tie up Flinders because he did not want to see anyone hurt. Sharon testified Neal asked her to knock on the door because Flinders "would open the

---

[1] Sharon testified defendant was in the bedroom at her house sometime after the June 6, 1982 incident when Neal and his friend Martin came by and "started giving [Sharon] a real bad time about what had happened." They told her to keep her "mouth shut and that [she] was to blame everything on" defendant and Ford. Neal "had it in" for defendant; Sharon did not know why. Martin threw Sharon into a chair and threatened to overdose her with cocaine when defendant came in with a gun and told them to leave. Sharon testified Martin also called her and told her to get $50,000 from her mother-in-law. She and her husband received additional threats and Sharon was beaten by three people she did not know who told her she knew what she "had to do" and she "better do a good job." She was treated at a hospital for her injuries.

6.

door for a woman." She then went to Flinders's house assuming they were going to "buy"; she put on a wig because she had never been involved in a transaction involving "dope." She left the house with defendant, Ford, Neal, and Jesse I. At some point in the car, Neal was telling Jesse I. he "was going to go over and take this guy's dope," and defendant told Neal to "shut up." The group dropped Jesse I. at his home. Neal then asked defendant to take him to his house. They went to Neal's house and Neal went inside. Next, they went to defendant's house because his wife was sick. Sharon went inside defendant's house to use the restroom while defendant was in the bedroom with his wife. Sharon saw one "long shotgun rifle bullet" on the nightstand or coffee table while inside. She previously testified defendant put bullets in his pocket; but, at trial, she stated that was a lie. After they left defendant's house, they went to Flinders's house; Neal directed defendant where to go. In the car, Neal was "going off" about Flinders and how he owed Neal and "he was going to get what he had coming." Sharon, Ford, and Neal went up to the house; defendant was "on the side; he didn't go all the way fully up." Sharon testified defendant was 15 to 20 feet away; she could not see him from where she was at the door. Sharon and Ford went to the door. Sharon knocked and said, "My name is Sharon." The person inside said, " 'Wait a minute.' " "Neal got impatient and he told [Ford] and [Sharon] to yell, 'Skidoo,'" so they did. ("Skidoo" is apparently a nickname or the phonetic pronunciation of "SCDEU," the Stanislaus County Drug Enforcement Unit.) Neal "got mad," "acted like a wild man," and "came flying around the corner and he hit the door" open. Flinders had a long gun he pointed at Sharon. Ford pushed her flat down and she heard a gun go off. She testified she did not know who was holding the gun that fired. She saw Flinders fall. Sharon then went around the side of the house and "got sick." She saw Neal going through Flinders's wallet and Ford was just standing there. Sharon left and then came back in and saw defendant inside by the china cabinet and "[h]e was in a state of shock." At some point, Sharon went over to Neal, who was at a desk. He had a white pillowcase and was putting a stereo inside and she handed him a

7.

box of seashells that he also put in the pillowcase.  Neal went into the bedroom and Ford was with him.  Sharon saw defendant and Ford conversing outside of the car; they were both upset, and she was pretty sure defendant hit Ford.  Neal got in the car and told Sharon he did not know why Ford shot Flinders.  In the car on the way home, defendant was mad at Ford; he asked Ford why he shot Flinders.  Ford started crying and said because he was going to shoot Sharon.  When they got back to the house, defendant brought in a purse, and he and Sharon looked inside the purse; it had S.P.'s driver's license in it.  Defendant told Sharon he gave Ford $100 because Ford was upset.  With her husband's help, Sharon burned the purse and seashells in the fireplace.  Neal was telling them, " 'This wasn't supposed to happen; it is all you guys' fault.' "  After people left, Sharon went into the garage and saw a rifle in a vase; she told her husband to get rid of it.

Detective Vaughn testified Sharon Poma told him on August 20, 1982, that she went with Neal to collect a debt from Flinders and she was going to knock on the door to get him to open it.  She never stated they went to Flinders's house to commit a robbery.  She reported "Skidoo" was yelled and then the door was kicked in and Ford shot Flinders.  Vaughn testified that on September 29, 1982, he took a statement from defendant about the incident after giving defendant his *Miranda*[2] warnings.  Defendant denied knowledge of the murder or that he had anything to do with it.

Sharon's cousin Jeffery Todd testified Sharon told him a "[c]ouple of times" that Neal shot Flinders.  She also stated Ford could have shot, "but it wasn't very likely because he shoved her out of the way when the gunshot went off."  Todd understood it to be an "accidental shooting."

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

**Defense Evidence**

Defendant and his wife Carin testified in his defense. Defendant testified Ford and his girlfriend Elaine Spears came over to defendant's house on the evening of June 6, 1982. Ford brought a bottle of tequila. After about half an hour, defendant, Carin, their minor daughter, Ford, and Spears all went over to the Pomas' house. Carin sat on the couch and defendant sat at the kitchen table with Ford for some time. Defendant took two Valiums and he and Ford were drinking tequila. Neal and Judy H. arrived; defendant had seen Neal "probably twenty times" before. Neal asked if anyone had weed but nobody had any. Neal said he knew where they could "cop" some weed; someone owed him some. Defendant denied there was any discussion about a robbery that evening or that he mentioned they would need a gun. He did not know Flinders. They left the house to go to the liquor store and to get some weed. Defendant was driving, Sharon was in the front seat, and Ford, Neal, and Jesse I. were in the backseat. They dropped off Jesse I. and went to the Stop-N-Save to get liquor and cigarettes and Pepsi for Sharon. They continued driving with Neal telling defendant where to go; defendant denied they stopped by defendant's, Charlie Bryant's, or Neal's houses. Rather, they went directly to Flinders's house. When they stopped, everyone got out. Neal asked defendant if he was going and defendant said no because he "didn't know the man." Defendant was on the sidewalk for a minute or so but he "did not go up to the house." He denied hearing a gunshot or anything from Flinders's house. He went back to the car and had his head resting on the steering wheel when Sharon, Ford, and Neal got in the car. Defendant denied slapping Ford at any time. Sharon said, " 'Let's go,' " so defendant started driving back to the Pomas' house. Sharon was going through a purse as he was driving. When they got to the house, Sharon carried the purse inside and Neal had a pillowcase. Defendant took the purse from Sharon and things fell out of it, including a license. He testified they left to go home about 10 minutes later. When they got to defendant's house, defendant asked Ford what was wrong, and Ford said he " 'did not do anything.' "

9.

Defendant testified he was at the Pomas' house approximately a week later when Neal and his friend Martin came by. Defendant was in the bedroom packaging cocaine. He walked out and saw Neal and Martin talking to Sharon; they were "fixing some cocaine." Defendant denied hearing Neal or Martin threaten Sharon, but Martin looked mad and was talking "[r]ough." Defendant denied pulling a gun on them. He testified, the first time he heard a murder occurred on June 6, 1982, was after he was arrested and interviewed by the police.

Carin Aleo testified she went to the Pomas' house on the evening of June 6, 1982, with defendant, their minor daughter, Ford, and Elaine Spears. When they went inside, defendant and Ford sat at the kitchen table and Carin and Elaine sat on the couch in the living room. The Pomas, Ford, defendant, and Elaine were drinking a bottle of liquor Ford had brought with him and they were conversing. Eventually, Neal and Judy H. arrived and sat at the kitchen table; Carin had not met them before. Neal asked if anyone knew where he could get some pot. Defendant and Ford wanted to go to the liquor store for more alcohol; Carin got upset and told them not to go. Neal asked defendant and Ford if they could give him a ride to the house of a guy who owed him pot. Sharon asked if she could join and they agreed. The group was gone for about an hour and when they came in the door, Carin was mad. Ford was "pretty drunk" and defendant told Carin to "be quiet." Defendant, Carin, the child, Elaine, and Ford left together about 10 minutes later to defendant's house.

Sharon's sister Judy Wisdom also testified on behalf of the defense that Sharon told her about the events of June 6, 1982. Wisdom testified she had loaned Sharon $60 to buy marijuana that day. Sharon told Wisdom she, Ford, defendant, and Neal went to purchase marijuana, and when the man answered the door, he had a shotgun. Defendant "wasn't near the door. He was around the corner or something." Ford pushed Sharon down and she fell; she then heard a gunshot, but she did not see who fired it. Sharon

10.

cried to Wisdom that she made a mistake in saying Ford had fired the shot because he had pushed her down and the only person left to shoot the gun was Neal.

Ford's attorney called Elaine Spears. She testified she was with Ford at the Pomas' home that night. She denied hearing anyone say anything about a robbery but heard something about marijuana. She testified Ford, defendant, Neal, and Sharon left to go to the liquor store at some point and returned approximately 30 minutes to an hour later.

Frank Ford testified he was 17 years old on June 6, 1982. He went over to defendant's house that night with Spears, his girlfriend. They were drinking tequila and left to go to the Pomas' house about 20 minutes later. Ford was sitting at the kitchen table. He and defendant discussed going to the liquor store; Sharon said she also wanted to go. Neal arrived later with his "daughter." They passed the bottle of tequila around and Neal took a few drinks. They hung out for about 30 minutes; Ford denied hearing any talk at the kitchen table about going to commit a robbery. Defendant, Ford, Sharon, Neal, and Jesse I. got in the car and they dropped off Jesse I. Then, they went to the liquor store. When they got back in the car, Neal "wanted to go somewhere" and he gave defendant, who was driving, directions; Neal did not say where he wanted to go. Ford denied they stopped at Neal's or defendant's house.

At some point, the car stopped and Sharon told Ford to come out. Ford heard Neal ask defendant if he was going to get out and defendant said he was going to stay in the car. Ford, Neal, and Sharon walked down the sidewalk and up to the house. Ford testified he did not know who Dixon Flinders was and did not know to whom the house belonged. Ford tapped on the door with his foot to knock and Sharon kicked the door with her foot. Ford heard chatter through the door. Then, "all of a sudden" Neal moved beside Ford and kicked in the door. When the door opened, Ford saw a man pointing a gun in his direction. He pushed Sharon with both hands "out of the way of the door" and went to his knees; he heard a popping sound. Ford denied he had a gun in his hands. He

11.

testified he turned around and saw Neal with a gun in his hand. Ford stood up and Neal told him to " '[g]et in here.' " Ford went into the house; he denied going into the bedroom. He testified he did not intend to commit a burglary, rob anyone, or steal anything when he went in the house. Sharon was in the front room "going through things," "pulling open drawers and stuff." Ford testified he saw Neal "put stuff in [a] pillowcase." Before they got back to the car, Neal told Ford, " 'You don't tell nobody.' " When Ford got back in the car, defendant was in the front seat with his head on the steering wheel. Ford saw Neal with a rifle and a pillowcase in his hands; Neal put the rifle and pillowcase in the trunk. They went back to the Pomas' residence and then left with defendant. He denied seeing a fire in the Pomas' fireplace or that anyone gave him money that night. He recalled seeing Sharon dumping a purse out in the kitchen; defendant was by her side holding up a card. Ford testified he did not hear the name Dixon Flinders until he spoke to Detective Vaughn and he reported he did not know anything about Flinders's murder when he spoke with police.

**Petition for Resentencing**

In 2019, defendant submitted a petition for resentencing related to his convictions pursuant to former section 1170.95 (now § 1172.6). He checked boxes stating a charging document had been filed against him allowing the prosecution to proceed under a felony-murder theory or the natural and probable consequences doctrine; at trial, he was convicted of first or second degree murder under a felony-murder theory or the natural and probable consequences doctrine; and he could not now be convicted of murder in light of changes made to sections 188 and 189, effective January 1, 2019 (pursuant to Senate Bill No. 1437). He also checked a box indicating he was convicted of first degree murder but could not now be convicted because he was not the actual killer, he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree, and he was not a major

12.

participant in the felony or did not act with reckless indifference to human life during the course of the crime or felony. He also checked a box stating, "I request that this court appoint counsel for me during this re-sentencing process."

The court initially denied the petition for resentencing without issuing an order to show cause or holding an evidentiary hearing, stating it found defendant "was a major participant in the crime" and "therefore, not eligible for resentencing." In a previous opinion, our court reversed the court's order denying defendant's petition for relief without issuing an order to show cause and holding an evidentiary hearing, concluding the record did not establish he was ineligible for relief as a matter of law. Accordingly, we directed the court to issue an order to show cause and to hold a hearing during which the prosecution would bear the burden of proving, beyond a reasonable doubt, that defendant is ineligible for resentencing.

Thereafter, defendant filed a "Preliminary Response to Motion to Dismiss and Demand for Jury Trial" on March 4, 2022. He asserted the prosecution and defense agreed "the sole issue is whether defendant acted with reckless indifference to human life such as would render him culpable for murder under . . . [former] section 1170.95" and he "lacked the *mens rea* of implied malice necessary for a conviction for murder." He argued all the "*Clarke* [*sic*] factors . . . militate toward the defendant's exoneration." He argued, he did not use a firearm during the offense and was "merely aware that a gun was being used." Next, he asserted, it was "undisputed that the defendant **was not even there** when the murder occurred." (Boldface in original.) Additionally, there was "no restraint of victim. The shooting, at which defendant was not present, occurred suddenly and unexpectedly after defendant's co-defendant spontaneously, and *contrary to a pre-arranged plan with defendant*, kicked in the victim's door and found victim pointing a rifle at him." Additionally, the plan was to "enter the house peacefully, by a ruse, and tie up victim," not kill him. Defendant was "very angry with the co-defendant" and

13.

"upbraided him for the gratuitous killing."  Defendant argued that he had a constitutional right to a jury trial on the elements of the offense.

In an order to show cause brief, the People asserted they would prove at the evidentiary hearing that defendant was not eligible for resentencing because he would still be convicted of murder as a major participant who acted with reckless indifference. The People asked the court to take judicial notice of the entire record of conviction, including the complete trial transcripts, and stated their intent to use excerpts from defendant's 2004, 2008, 2014, 2017, 2019, and 2021 parole board hearings during which he discussed his role in the crime.  They asserted defendant was a major participant in the robbery and burglary that resulted in Flinders's murder and he acted with reckless indifference to human life.

As to the major participant elements, the People argued defendant "was a key planner of the robbery and burglary that resulted in Mr. Flinders's murder" in that he "was the first to bring up robbing someone that night."  (Boldface omitted.)  They asserted defendant was also "the first to bring up the need for a gun" (boldface omitted), and he suggested tying up Flinders when Neal suggested Flinders was scary.  Next, they argued there was evidence defendant stopped at his house and picked up a bullet or bullets on the way to the victim's house.  And defendant admitted in his 2017 parole hearing he knew they stopped to get a gun and knew "they" were armed when they went up to Flinders's door.  He also told the 2019 parole board he saw the gun on the way to Flinders's house and he drove there anyway.  With regard to the third *Banks* factor (*People v. Banks* (2015) 61 Cal.4th 788 (*Banks*)), they asserted defendant was aware of "particular dangers posed by the nature of the crime":  they set out to rob a marijuana dealer's home at 11:00 p.m.; he was told the victim was "scary" and they would have to threaten to kill him to get what they wanted; and other people were present, namely S.P. and her five-month-old babies.  They argued, defendant was "present at the scene of the killing" (boldface omitted) and there was testimony he was "just feet from the front

14.

porch" when the victim was shot. Additionally, Sharon Poma testified defendant went into the home, and he admitted during his 2014 parole hearing that he went inside despite denying it in his 2004 and 2008 parole hearings. Additionally, after lethal force was used, defendant "rifled through Mr. Flinders's closets, drawers, and cupboards, as he was laying on the floor dying," and defendant found $100 to give to Ford. He "managed the killer's escape route by driving them all away from the home." And he and Sharon Poma searched through S.P.'s purse at the Poma home.

Regarding the reckless indifference elements, the People argued defendant knew a gun would be used in the robbery and burglary and he was present for the entire crime. They argued, defendant was just a few feet away from the shooter and "positioned to act as a restraining influence" (boldface omitted), noting defendant is Ford's uncle and "was in an authority position over him." With regard to the duration of the crime, the People asserted, though it did not take long, there was a significant opportunity for violence. They also argued defendant knew Neal was violent in that he had been with Neal at least 20 times before the crime; he knew Neal was into drug dealing; and Neal bragged about his criminal activities that night. Additionally, defendant knew Neal had a loaded gun that night. Finally, they asserted defendant made no attempt to minimize the risk of violence during the crime and made no effort to aid the victim following the use of lethal force. The People attached to their brief numerous exhibits including the jury instructions, our court's prior opinions in this matter, and parole hearing transcripts.

**Evidentiary Hearing**

The court held an evidentiary hearing on defendant's petition for resentencing in May and June 2022. Defense counsel objected to the consideration of the parole hearing transcripts, asserting the People had to provide a foundation for the excerpts they planned to use. The prosecutor responded the court could use the statements made at the parole hearings because they were made voluntarily, under oath, and defendant was expressly

advised he had a choice regarding whether to talk to the board. She asserted, "[a]s to authentication and foundation, these are official records. This is the record of the proceedings. It contains a certification at the end from the court reporter that certified each record." The court stated it knew it could "consider those statements," and confirmed the reporter's certifications of the parole transcripts. The court also marked transcripts from the trial offered by the prosecutor as exhibits in the hearing.

Codefendant Frank Ford was the sole witness who testified at the hearing. Ford testified the plan, proposed by defendant, was for Sharon Poma to go to the door because it was "easier" for Flinders to open the door to a woman. Sharon banged on the door and yelled something to do with law enforcement. Ford was standing at the door and "it wasn't working." Neal "got a little mad and kicked open the door." Then, Sharon went in the house with Ford. Ford testified, when he walked in the door, he saw Flinders with a gun, so he pushed Sharon to the side and shot Flinders in the chest. Neal then "grabbed his gun back" from Ford. Ford believed defendant was still in the vehicle at that time. Ford denied there was a plan to shoot the victim; he stated he shot because he was "startled" seeing Flinders with a gun. He testified he did not know if defendant "knew there was a gun." Ford got the gun from Neal.

After the presentation of evidence, the prosecutor argued defendant was a major participant who acted with reckless indifference to human life. The prosecutor went through the five factors detailed in *Banks*, *supra*, 61 Cal.4th 788 related to the major participant inquiry. As to defendant's role in the crime, she asserted defendant "came up with the plan that Sharon was the one that was going to go knock on the door because [Flinders] would be more likely to open the door for a woman." Additionally, at trial, William Poma testified defendant, Ford, Neal, and Sharon sat around the table at his house before the offense and planned how it would occur. Defendant "was the first to bring up robbing somebody that night." Neal stated Flinders was "scary" and defendant suggested tying up Flinders. Defendant also said, "Let's bring a gun and we can get what

16.

we want." With regard to defendant's role in supplying the weapons, the prosecutor noted the People could not prove the gun came from defendant, but "[t]here was some evidence presented at trial that [defendant] picked up large bullets or bullets when he stopped by his house on the way to Mr. Flinders's house," and a .22-caliber long bullet was used to kill Flinders. Also, defendant "was the first to talk about needing guns that night," he knew there was a gun, and there may have been an additional gun in the car. As to the third factor, defendant's awareness of dangers posed by the crime, weapons used, or past experience with participants, she argued, defendant knew they were going to get marijuana from a drug-dealer based upon Ford's testimony at the hearing and Neal said Flinders was "scary." In suggesting they bring a gun and tie up Flinders, defendant "knew they were going to have to threaten" Flinders to get the drugs they wanted. Additionally, they were going to Flinders's house at night, unannounced, where he lived with two infant children. Regarding the fourth factor, defendant's presence at the scene, the prosecutor cited to defendant's 2014 parole hearing transcript in which defendant stated he entered the house after the door was kicked in. She also argued Flinders's wallet was found on the floor empty of cash and at some point defendant gave $100 to Ford, though defendant did not have any money when they were talking at the table before the offense. She argued defendant acted with reckless indifference during the robbery since he was the first to suggest a gun and violence, i.e., tying up the victim. He drove the group to the robbery of a "scary" drug dealer's house at night unannounced knowing that a gun would be used. She argued defendant was "physically present for the entire act." She asserted his admissions in the parole hearings show he got out of the car and was running up to the house when the gun was fired; "[h]e was just a few feet away when the crime occurred" and "was in a position to act as a restraining influence." She argued there was an opportunity for violence and defendant knew Neal was violent as he had "been with him at least 20 times before the crime" and there was trial testimony Neal "bragged about his criminal activities" that night at the table. Additionally, defendant

17.

knew Neal had a loaded gun in the car and defendant was "willingly involved in the violent manner in which the offense was committed." The court and the prosecutor agreed the fifth factor was "clear" that defendant did not "do anything to minimize the violence or aid the victims." The prosecutor further argued defendant ended up with S.P.'s purse and he and Sharon went through it at home later that night.

Defense counsel asserted, there was never a plan to kill the victim. Rather, "Neal loses his patience and starts kicking in the door and yells SCDEU and starts breaking in the door. It's a total variation from the plan." He asserted defendant had a role "and that role would have minimized the chance of violence and death." He denied defendant used or supplied a gun and asserted "[i]t's clear . . . [the] shotgun shells he picked up . . . had nothing to do . . . with the crime in this case." He argued defendant was "only present in a very loose sense. He really isn't present." Rather, defendant was 15 to 20 feet away around the corner based on Poma's testimony and "[h]e could not have helped." The trial court indicated it would come back at a future date to announce its ruling after it had an opportunity to read the trial transcripts. The court held another hearing on June 13, 2022, and stated it had reviewed the arguments of counsel, the trial transcript, and the various parole hearing transcripts in the matter.

The court found that defendant, "in addition to being the driver and including the getaway driver, he was a major participant because he was aware that the parties were armed and accompanied them. And as the driver, and even though he saw the gun, he continued to drive towards the home where the victim was living with his wife and children. [¶] And there was no evidence in the trial that anybody called Mr. Flinders to see if he would be home to purchase the drugs, and instead they all showed up late at night, armed, and with a ruse claiming it was drug enforcement. They sent a woman to the door to knock on the door, thinking that Mr. Flinders would be more likely to open the door to a woman. And then when they did not answer right away, there was a call made concerning or statements made about being drug enforcement and wanting to raid

18.

the home." The court concluded, "it's clear, based on the evidence, that [defendant] knew that a weapon would be used. There is some evidence that he did attempt to obtain some bullets. It does look like they were shotgun shell bullets, based on the testimony." Additionally, defendant went in the house and through Flinders's wallet and defendant "had some of the property from the wallet." He "did nothing to minimize the chance that this would be likely to kill, since he was aware they were going to the house to commit a robbery with a weapon at night and continued to drive them." Accordingly, the court concluded "even under the change in law" defendant "would have been convicted."

PAROLE HEARING TESTIMONY

### March 11, 2004, Parole Hearing Transcript

In the March 11, 2004 parole hearing transcript, the presiding commissioner explained to defendant that he was "not required to discuss the offense" or "to admit to guilt." Defendant provided sworn testimony. He admitted to being present during the crime but initially stated he was not responsible for Flinders's death, though he later stated he took "all of the responsibility." He was "responsible for taking everybody there." Defendant denied ever entering Flinders's house or taking any items, such as a purse, out of the house. He testified he was sitting in the car and never left the vehicle, except once because he thought he was going to throw up. He stated he "didn't know what happened until after the fact." He also testified they went to Flinders's house to buy marijuana; they did not "go there to steal or rob anybody." He denied ever seeing a weapon but testified he knew from his nephew Ford's testimony that Neal handed Ford a gun. Defendant admitted that he "might be minimizing a little bit. That might be true."

### June 20, 2008, Parole Hearing Transcript

In the June 20, 2008 parole hearing, defendant again gave sworn testimony. He testified they went to Flinders's house to purchase marijuana; Neal said the victim owed him pot or money. Defendant denied awareness that "anybody was going to rob

anybody" before the crime. He stated he was in the car in front of the house when the crime occurred. He denied hearing gunfire. He testified he did not know anyone was armed until after the crime. He denied seeing a rifle and stated Neal put it in the trunk. Everyone got in the car and told defendant, "let's go." When they got back to the house, defendant's nephew told him what happened and defendant "lost it."

### September 17, 2014, Parole Hearing Transcript

Defendant also testified in a September 17, 2014 parole hearing. He stated he drove the group to Flinders's house and did not know at first that a robbery was going to happen but he "sorta knew." They stopped at Neal's house, but defendant denied knowing Neal was going to get a gun or that a gun was involved until after the incident. He knew he "was in trouble" when he got out of the car and the door was kicked in and Flinders had been shot. He testified the shot was fired before he got to the door, and he admitted he went in the house "to see what was going on." He initially denied taking anything from the house but then stated he did not recall if he or Sharon took a purse.

### August 30, 2017, Parole Hearing Transcript

At the August 30, 2017 parole hearing, defendant testified they went to Flinders's house because Neal "wanted his 70 bucks or some marijuana but he said if he isn't going to give it to me, we're going to take it." Defendant stated he was "pretty high but . . . sort of knew what was going on." He, Ford, Sharon, and Neal went to Flinders's house. Defendant admitted he "knew there was a weapon." Defendant stated he was in the car when the others went to the door and knocked on it. Then, Neal kicked the door in and the victim was holding a rifle and Ford shot him. Defendant testified he was "sitting there waiting," but then he got out of the car because he was "pretty messed up." He could not recall if he heard a gunshot. He walked up to the house, stepped inside, and he saw Flinders lying there. Defendant was "scared to death." He denied touching anything in the house and stated "[t]hey took a purse" and Neal threw something in the trunk.

20.

**February 13, 2019, Parole Hearing Transcript**

At a February 13, 2019 parole hearing, defendant again testified that Neal said at the kitchen table that Flinders owed him $70 or some marijuana and, if he did not pay it, he would "just take it." Defendant "figured there was a robbery." He drove them to Neal's house first and defendant saw a firearm as he drove the group to Flinders's house. Defendant testified he was sitting in the car and then walked up to the house and the door was wide open and he saw Flinders lying there. Defendant "totally freaked out." He denied hearing a shot. He stated he left and dropped everyone off and Ford told him what had happened. He testified it never entered his mind that someone would get murdered.

**January 13, 2021, Parole Hearing Transcript**

At a January 13, 2021 parole hearing, he again testified that Neal wanted to go to Flinders's house because Flinders owed him $70 or some marijuana and, if he did not give it to him, they would "just take it." Defendant took the group first to Neal's house where Neal got a gun and then to Flinders's house. Defendant "found out what happened after [he] got out of the car." He walked up to the door and saw Flinders lying there in blood. He went back to the car and then drove them home. He denied taking S.P.'s purse.

## DISCUSSION

Defendant challenges the denial of his petition for resentencing, asserting insufficient evidence supports the trial court's conclusion he is ineligible for relief and the court prejudicially erred in admitting the parole hearing transcripts as evidence at the evidentiary hearing. We reject defendant's contentions.

### I. Senate Bill No. 1437 and Senate Bill No. 775

On September 30, 2018, the Governor signed Senate Bill No. 1437, which became effective on January 1, 2019. Senate Bill No. 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with

the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) It amended section 188, which defines malice, and section 189, which defines the degrees of murder to address felony-murder liability. (Stats. 2018, ch. 1015, §§ 2–3.)

Accordingly, section 188 now provides that, "[e]xcept as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. *Malice shall not be imputed to a person based solely on his or her participation in a crime.*" (§ 188, subd. (a)(3), italics added.) The change reflects the Legislature's intent that "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)

Additionally, former section 189 previously stated, "All murder . . . which is committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any act punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree." Senate Bill No. 1437 amended section 189, in part, by adding subdivision (e), which provides:

> "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."

The legislation also added section 1172.6 (former § 1170.95), which provides a procedure by which defendants whose cases are final can seek retroactive relief if the changes in the law would affect their previously sustained convictions. (Stats. 2018,

ch. 1015, § 4.) Initially, this section permitted those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts . . . ." (Stats. 2018, ch. 1015, § 4, subd. (a).) In Senate Bill No. 775 (2021–2022 Reg. Sess.), effective January 1, 2022, the Legislature amended the language of section 1172.6 to clarify and expand the scope of the petitioning procedure to defendants convicted of attempted murder or manslaughter under a now prohibited theory.

Pursuant to amended section 1172.6, upon receiving a petition, if the petitioner has requested counsel, the court must appoint counsel to represent the petitioner. (§ 1172.6, subd. (b)(3).) "After the parties have had an opportunity to submit briefings, the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1172.6, subd. (c).) If the petitioner has made such a prima facie showing of entitlement to relief, the court "shall issue an order to show cause." (*Ibid.*) "Within 60 days after the order to show cause has issued, the court shall hold a hearing to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1).) At the hearing, the burden of proof is on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to section 188 or 189 made effective January 1, 2019. (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (*Ibid*.) "The prosecutor and the

23.

petitioner may also offer new or additional evidence to meet their respective burdens." (*Ibid.*)

If, at the hearing, the prosecution fails to prove beyond a reasonable doubt that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019, "the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).) "The petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes if the petitioner is entitled to relief pursuant to this section, murder or attempted murder was charged generically, and the target offense was not charged." (§ 1172.6, subd. (e.).)

## II. Sufficient Evidence Supports Finding Defendant Acted with Reckless Indifference to Human Life

Defendant argues the evidence was insufficient to prove he acted with reckless indifference to human life; accordingly, his murder conviction must be reversed. We disagree.

### A. Standard of Review

On appeal from a denial of relief following an evidentiary hearing under section 1172.6, subdivision (d), we review the trial court's factual findings for substantial evidence. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Cooper* (2022) 77 Cal.App.5th 393, 412.) Under that familiar standard, " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt' " under sections 188 and 189 as amended. (*People v. Morales* (2020) 10 Cal.5th 76, 88; *Clements*, *supra*, at p. 298.) To that end, we presume the existence of every fact

the court as fact finder could reasonably deduce from the evidence in support of the court's order. (See *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626.)

## B. Applicable Law

Section 190.2 "identifies the circumstances under which murderers and accomplices can be punished by death or life imprisonment without parole. . . . For defendants who did not kill and lacked intent to kill, section 190.2, subdivision (d) permits such punishment only if they acted 'with reckless indifference to human life and as a major participant' [in] a qualifying felony like robbery." (*People v. Douglas* (2020) 56 Cal.App.5th 1, 7; see *In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).) By incorporating this requirement, section 190.2 codified the holding of *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), bringing California law "into conformity with prevailing Eighth Amendment doctrine." (*In re Ramirez* (2019) 32 Cal.App.5th 384, 393; see *People v. Clark* (2016) 63 Cal.4th 522, 609 (*Clark*); *People v. Estrada* (1995) 11 Cal.4th 568, 575; *In re McDowell* (2020) 55 Cal.App.5th 999, 1004.) Section 190.2 thereby requires courts to "examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*Banks*, *supra*, 61 Cal.4th at p. 801.)

*Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) held the death penalty could not constitutionally be imposed on a robbery getaway driver who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill or any culpable mental state. (*Id*. at pp. 784, 791, 798, 801; *Scoggins*, *supra*, 9 Cal.5th at p. 675.) *Tison*, in contrast, did not preclude imposition of the death penalty for two defendants, brothers who helped their father and his cellmate—both convicted murderers—escape from prison. (*Tison*, *supra*, 481 U.S. at pp. 139, 151–152, 158.) The brothers locked up the prison guards and armed the two prisoners during the escape. (*Id.*

at p. 139.)  A few days later, the group's vehicle got a flat tire.  (*Ibid.*)  One of the brothers flagged down a passing car for help.  (*Id.* at pp. 139–140.)  The group then kidnapped the family of four that was in the car, robbed them, and drove them into the desert.  (*Id.* at p. 140.)  The sons stood by while the father and cellmate shot the victims repeatedly.  (*Id.* at p. 141.)  The perpetrators left the family—which included a toddler and a teenager—to die in the desert and drove off in the family's car.  (*Id.* at pp. 139–141.)  *Tison* held the Eighth Amendment does not prohibit imposition of the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life." (*Id.* at p. 152; see *id.* at pp. 157–158.)

*Enmund* and *Tison* helped define the constitutional limits for death penalty punishment of accomplices to felony murder and establish a " 'spectrum of culpability,' " with felony murderers who " 'actually killed, attempted to kill, or intended to kill' " at one end, and minor actors who were not present on the scene and neither intended to kill nor had any culpable mental state at the other end.  (*Scoggins*, *supra*, 9 Cal.5th at p. 675; accord, *Banks*, *supra*, 61 Cal.4th at pp. 794, 800; *In re Loza* (2017) 10 Cal.App.5th 38, 46.)  "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than . . . Enmund's, lies the constitutional minimum" required for the imposition of a sentence of death or life without the possibility of parole.  (*Banks*, at p. 802.)  *Tison* and *Enmund* did not establish a ceiling or floor for determining when an aider and abettor is eligible for such a sentence, however.  (*In re Miller* (2017) 14 Cal.App.5th 960, 974, fn. 4; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1014, fn. 4.)  The fact a particular defendant appears more culpable than Enmund does not automatically make him death eligible; conversely, neither must a defendant be as culpable as the Tison brothers in order for section 190.2, subdivision (d) to apply.  The question is one of degree.  (*In re Miller*, *supra*, at p. 974, fn. 4; *In re Bennett*, *supra*, at p. 1014, fn. 4.)

In *Banks* and *Clark*, our state Supreme Court clarified the meaning of the "major participant" and "reckless indifference to human life" requirements. *Banks* considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant." (*Banks*, *supra*, 61 Cal.4th at p. 794; accord, *People v. Strong* (2022) 13 Cal.5th 698, 721 ["*Banks* substantially clarified the law surrounding major participant findings"].) The *Banks* court listed various factors to be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, at p. 803, fn. omitted.)

*Banks* found insufficient evidence to show the defendant in that case—Matthews, a getaway driver for an armed robbery—was a major participant who acted with reckless indifference. (*Banks*, *supra*, 61 Cal.4th at pp. 804–808.) No evidence established Matthews's role in planning the robbery or procuring the weapons; during the robbery and murder he was absent from the scene, sitting in a car and waiting; and no evidence showed he had any role in instigating the shooting which was "a spontaneous response to armed resistance from the victim," or could have prevented it. (*Id.* at p. 807; see *id*. at p. 805.) He was "no more than a getaway driver," like Enmund. (*Id.* at p. 805.) The *Banks* court further noted the Supreme Court "made clear felony murderers like Enmund, who simply had awareness their confederates were armed and armed robberies carried a risk of death, lack the requisite reckless indifference to human life." (*Id*. at p. 809.)

The following year, in *Clark*, the court addressed the "reckless indifference" determination. (*Clark*, *supra*, 63 Cal.4th at pp. 614–623; accord, *People v. Strong*, *supra*,

27.

13 Cal.5th at p. 721 ["*Clark* recited the teachings of *Banks* on the major participant question and substantially clarified the relevant considerations for determining whether a defendant has acted with reckless indifference to human life"].) Reckless indifference to human life may be " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' [Citation.]" (*Clark*, at p. 616, quoting *Tison*, *supra*, 481 U.S. at p. 157.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, at p. 617.) Reckless indifference to human life has both a subjective and an objective component. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) Subjectively, " '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' " (*Ibid.*, quoting *Banks*, *supra*, 61 Cal.4th at p. 801; accord, *Clark*, at p. 617.) Objectively, " ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*Scoggins*, *supra*, at p. 677; see *Clark*, at p. 617.) The fact a robbery involved a gun or carried a risk of death is insufficient, by itself, to support a finding of reckless indifference. (*Clark*, at pp. 617–618; see *Scoggins*, *supra*, at p. 677 [" 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life"].)

*Clark*, like *Banks*, listed various factors to be considered when determining whether a defendant acted with reckless indifference: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or

her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677 [listing factors set forth in *Clark*, *supra*, 63 Cal.4th at pp. 618–623].)

Based on these factors, *Clark* concluded the defendant there did not act with reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at p. 623.) The *Clark* defendant was the "mastermind" who planned and organized a computer store robbery and waited across from the store's parking lot when the fatal shooting occurred. (*Id.* at pp. 612, 619.) His plan called for the robbery to take place after the store closed, when there would be fewer people present, for any remaining employees to be handcuffed, and for the use of a single, unloaded gun. (*Id.* at pp. 620–622.) However, during the robbery the mother of one of the employees—who had come to pick him up from work—entered the store, surprising the robbers, and the defendant's accomplice shot her. (*Id.* at pp. 537, 539.) As police cars arrived, the defendant fled the scene, leaving the shooter behind. (*Id.* at p. 537.) *Clark* concluded that the defendant—who was not armed, was not physically present in the store when the shooting occurred, did not have the intent to kill, and attempted to minimize the likelihood of violence by timing the robbery for a time when fewer people would be present, and by planning for the use of a single, unloaded gun—did not act with reckless indifference to human life. (*Id.* at pp. 611, 618–623; *Scoggins*, *supra*, 9 Cal.5th at p. 676.)

Our Supreme Court also considered the reckless indifference inquiry in *Scoggins*, *supra*, 9 Cal.5th 667. *Scoggins* found an insufficient showing of reckless indifference where the defendant planned an unarmed assault and robbery in which one of his accomplices deviated from the contemplated plan and unexpectedly killed the victim. (*Id.* at pp. 671–672.) There, the defendant was swindled by the victim in the purchase of three television sets. (*Id.* at p. 671.) In response, the defendant recruited two close friends to ambush the victim, " 'beat the shit' " out of him, and get the defendant's money

back, while the defendant waited at a nearby gas station. (*Id.* at pp. 671, 678.) When the victim arrived, one of the friends pulled out a gun and shot him. (*Id.* at p. 672.) In concluding the evidence was insufficient to establish the defendant acted with reckless indifference, the *Scoggins* court considered that he was not present at the scene of the murder, was not in a position to restrain the shooter, did not know a gun would be used or that the victim would be killed, he attempted to minimize the risk of death by ordering the assault to occur in a public place in broad daylight, and he acted ambiguously after the shooting. (*Id.* at pp. 677–683.)

After the passage of Senate Bill No. 1437, section 189, subdivision (e)(3) now provides that a participant in a robbery where a death occurs may be liable for murder if the person was "a major participant in the [robbery] and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." Because the factors articulated by the California Supreme Court in *Banks*, *Clark*, and *Scoggins* construe the language in section 190.2, subdivision (d), which the Legislature incorporated into section 189, subdivision (e), these factors apply when determining a defendant's eligibility for relief under section 1172.6 as a person convicted of felony murder. (See *People v. Strong*, *supra*, 13 Cal.5th at p. 710 ["Senate Bill [No.] 1437 relief is unavailable if the defendant was either the actual killer, acted with the intent to kill, or 'was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of . . . Section 190.2.' [Citations.] The latter reference is to the same statute, containing the same two elements, that this court had clarified in *Banks* and *Clark*, shortly before Senate Bill [No.] 1437 was enacted"]; accord, *In re Taylor* (2019) 34 Cal.App.5th 543, 561 ["the standard under section 189, subdivision (e)(3) for holding such a defendant liable for felony murder is the same as the standard for finding a special circumstance under section 190.2[, subdivision ](d), as the former provision expressly incorporates the latter"].) Thus, we look to these factors in reviewing for

substantial evidence a court's finding that a defendant was a major participant who acted with reckless indifference to human life.

Recently, the California Supreme Court revisited the reckless indifference to human life standard in *Emanuel*, *supra*, 17 Cal.5th 867. In that case, Emanuel and his coperpetrator, Whitley, set up a meeting with the victim to obtain " ' "weed." ' " (*Id*. at pp. 875–878.) The victim texted Emanuel at 3:06 p.m. stating he was at the park and they could " 'do this.' " (*Id*. at p. 876.) Based on witness testimony, a shooting occurred at approximately 3:15 p.m. on a residential street next to the park. (*Id.* at pp. 876–877.) A police officer who had interviewed Emanuel's former girlfriend, Santos, testified she reported encountering Emanuel and Whitley later that afternoon and Whitley told her he had " 'shot a white boy' " at the park, repeating, " ' "I shot him" ' three times." (*Id*. at p. 878.) Emanuel confirmed Whitley was telling the truth. (*Ibid*.) In a second interview, Santos reported that Emanuel told her that he and Whitley had gone to get " ' "some weed." ' " (*Id.* at p. 878.) Emanuel told Santos that the victim " ' "wasn't trying to give it up," ' " so Emanuel left. (*Ibid*.) When Emanuel was walking away, Whitley hit the victim but the victim did not knock out. (*Ibid*.) Whitley said he aimed the gun at the victim's leg, but the victim pushed it up. Whitley fired and the victim fell. (*Ibid*.) An individual who had an "on-again/off-again" romantic relationship with Whitley testified Whitley showed her a news story about the shooting and told her that he and Emanuel were involved. (*Id.* at p. 879.) He told her "he was 'trying to rob the boy of some weed' and accidentally shot him in the neck while aiming for his foot." (*Ibid*.) A jury convicted Emanuel and Whitley of first degree murder in 2015 following a joint trial. (*Id*. at p. 879.) The jury also found true an allegation Whitley personally discharged a firearm resulting in death. (*Ibid*.)

In 2018, Emanuel filed a petition for resentencing in light of the passage of Senate Bill No. 1437. (*Emanuel*, *supra*, 17 Cal.5th at p. 881.) The trial court issued an order to show cause, finding the petition established a prima facie case for relief. (*Ibid*.)

Following an evidentiary hearing, the trial court denied Emanuel's petition for relief finding he was a major participant who acted with reckless indifference to human life. (*Ibid*.)  The trial court found Emanuel had " 'created' " the situation by participating in the robbery and "had an affirmative obligation to do more than withdraw his aid and support from a murderous cohort"; he should have acted to " 'prevent' " the shooting as the robbery unfolded.  (*Ibid*.)

The California Supreme Court reversed the court's finding, concluding substantial evidence did not support the trial court's conclusion that Emanuel acted with reckless indifference to human life.  (*Emanuel*, *supra*, 17 Cal.5th at p. 896.)  The *Emanuel* court noted Emanuel did not use a weapon during the robbery and there was no evidence Emanuel knew Whitley possessed a gun, would bring that gun to the robbery, or was likely to use lethal force; thus, this factor did not weigh in favor of a finding of reckless indifference.  (*Id.* at p. 885.)  Next, the available evidence reflected that Whitley shot the victim after a brief struggle; there was no period of prolonged restraint.  (*Id.* at p. 886.)  So, the *Clark* factor concerning duration of the crime was neutral; it did nothing to heighten the risk of violence beyond that inherent in the robbery itself.  (*Ibid*.)  With regard to efforts taken to minimize the risk of violence, the *Emanuel* court noted Whitley and Emanuel arranged to meet the victim at a park at approximately 2:30 p.m.  (*Id*. at p. 887.)  It concluded the fact Emanuel planned to participate in a robbery in a public location during daylight hours where witnesses might be present did not support a finding of reckless indifference.  (*Ibid*.)  The *Emanuel* court noted the Court of Appeal conflated this *Clark* factor with the factor concerning physical presence at the scene and opportunity to restrain confederates or aid victims.  (*Ibid*.)  It cautioned lower courts to "take care to consider the presence or absence of evidence relating to each relevant factor on its own merits before considering the evidence in its totality."  (*Id*. at p. 888.)  It further explained that "[w]here an 'objective evaluation of the circumstances' of the crime suggests the risk of violence is grave, the defendant's apparent efforts to minimize

that risk may be unavailing. [Citations.] Conversely, the absence of such efforts does not necessarily evince a subjective disregard for risk where the objective circumstances of the planned crime suggest the risk of violence posed is no more than that inherent in any violent felony." (*Ibid*.) With regard to physical presence at the scene and opportunity to restrain confederates or aid victims, the high court found Emanuel "attempted to act as a restraining influence," noting the trial court accepted that Emanuel advocated that he and Whitley leave and he began walking away from the robbery when met with resistance. (*Id*. at p. 891.) The *Emanuel* court further explained, "where a crime unfolds quickly, this factor—the failure to restrain a cohort—cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so." (*Id*. at p. 892.) It noted Emanuel's flight was susceptible to differing interpretations and his "postflight conduct reflects a desire to avoid arrest"; "it reveals little about whether he acted with the requisite state of mind when the shooting occurred." (*Id*. at p. 895.) The *Emanuel* court reasoned, "even if a defendant is unconcerned that the planned felony resulted in a death, there must also be evidence that the defendant was aware of and willingly involved in the violent manner in which the felony was committed and consciously disregarded the significant risk of death that his or her actions created." (*Ibid*.) "[T]he governing standard is not satisfied by evidence that the defendant was generally indifferent to the fact that someone *has been* killed; it requires evidence that, at the time of the shooting, the defendant acted with indifference toward the grave risk that someone *could be* killed. Though the former may be evidence of the latter, it is insufficient, standing alone, to support murder liability." (*Ibid*.)

## C. Analysis

Defendant contends there was insufficient evidence he acted with reckless indifference to human life. He asserts he was not present when the victim was shot and,

33.

thus, "wholly unable to prevent the robbery."  Citing *Banks*, he asserts this was "[a]t worst," a " 'garden-variety armed robbery, where death might be possible' " and "the shooting was an impulsive reaction to unexpected resistance, as opposed to the culmination of a prolonged interaction that increased the opportunity for violence."  He argues, though he did not come to Flinders's aid and he enabled Ford, Neal, and Sharon Poma to escape, "those factors alone are not sufficient to support a finding of reckless indifference to human life."  He also contends the evidence he was a major participant in the crime was "very arguably also insufficient."  He contends he was only present after the shooting, and he was the getaway driver who did not play a major role in the victim's death.  Additionally, defendant did not "use" the gun that was present during the robbery, he was not aware of his codefendant's propensity for violence, nor was he in a position to prevent the shooting.  In response, the People rely heavily on defendant's actions after the shooting to argue defendant was a major participant who acted with reckless indifference to human life in that he entered the house and made no effort to aid the victim or summon aid, and he and another coparticipant went in and took another individual's purse after the shooting occurred.  They assert defendant was involved in the planning; he knew weapons would be used during the crime; and he was in close proximity to the shooting.

For the reasons that follow, we reject defendant's contentions and conclude there is sufficient evidence to support the trial court's finding he was a major participant in the underlying crime, and he acted with reckless indifference to human life.  First, because defendant also challenges the sufficiency of the evidence to support the trial court's conclusion he was a major participant and there is overlap in the inquiries, we begin by considering the evidence that defendant was a major participant in the crime.  (See *In re Loza*, *supra*, 10 Cal.App.5th at p. 52 ["factors demonstrating [defendant's] role as a major participant are highly relevant to the analysis of whether he acted with reckless indifference"].)  As discussed, factors we consider in determining whether defendant was a major participant include:  "What role did the defendant have in planning the criminal

34.

enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted; accord, *Clark*, *supra*, 63 Cal.4th at p. 611.)

Here, there was evidence defendant was involved in planning the armed robbery. That is, there was evidence he discussed the robbery at the kitchen table; he brought up the discussion regarding a gun; and he suggested tying up Flinders. There was also evidence defendant drove the group to the robbery; he stopped at Neal's house so Neal could get a gun for use during the robbery; defendant knew Neal had a gun; and there was some evidence from which the court could conclude defendant got a bullet or bullets from his house. There was also evidence Neal described Flinders as "scary," Flinders sold drugs, and they planned to go to his house armed and unannounced at night to rob him. Additionally, there was evidence from which the court could conclude defendant entered the house after Flinders was killed, saw his body lying on the floor, and he proceeded to take an item or items from the house. Additionally, as defendant concedes, it is undisputed he did not render aid to Flinders and he enabled his coperpetrators to escape by driving them away from the scene. Notably, there was no evidence defendant himself was armed or that he supplied Neal with the gun or that he was aware of his coparticipants' likelihood of killing. Though defendant admitted he had been around Neal about 20 times before and that Ford was his nephew, there was no evidence he knew Neal or Ford had a propensity for violence. There was also no evidence defendant was aware Flinders had been shot until after the shooting occurred; so, there was no evidence

he was in a position to prevent the murder or to act as a restraining influence immediately preceding the shooting. Rather, the uncontroverted evidence was that defendant was not right at the door when the shooting occurred; he was either in the car or by the side of the house.

Considering the totality of such evidence, and particularly in light of the evidence of defendant's role in planning the crime, that he instigated the use of the gun, he took the group to Neal's house to retrieve a gun and to the site of the robbery, and he went in the house after the shooting and saw the victim lying on the floor and did not provide assistance but instead helped his cohort escape and potentially took items from the house thereafter, we conclude the evidence is sufficient to support a conclusion he was a major participant in the underlying robbery. Thus, our analysis next turns to whether sufficient evidence supports the trial court's finding defendant acted with reckless indifference to human life, the crux of defendant's claim. (See *Scoggins*, *supra*, 9 Cal.5th at p. 677 ["Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?"].)

Notably, "factors demonstrating [defendant's] role as a major participant are highly relevant to the analysis of whether he acted with reckless indifference." (*In re Loza*, *supra*, 10 Cal.App.5th at p. 52.) So, the foregoing analysis regarding whether defendant was a major participant is relevant to our inquiry into whether there is sufficient evidence to support the trial court's finding that defendant acted with reckless indifference to human life.

Initially, as discussed, there was evidence defendant knew a gun would be used in the robbery; indeed, there was evidence defendant initiated the idea of using a gun and got bullets from his home. The evidence that defendant introduced the idea that a gun be used during the robbery supports a finding defendant elevated the degree of risk to human life during the commission of the underlying felony, weighing in favor of a reckless indifference finding. (See *Emanuel*, *supra*, 17 Cal.5th at p. 884 [" 'The degree of risk to human life is crucial to the analysis.' "].)

With regard to the next factor, while there was not specific evidence of the duration of the interaction, the available evidence suggests the shooting unfolded rapidly. Nevertheless, the evidence also supports a conclusion defendant and his coparticipants continued to engage in robbery efforts after the shooting occurred and someone threatened S.P. with additional violence during the post-shooting search of the house. Thus, there was evidence of a window of opportunity for violence given that the group planned to show up at night, unannounced and armed to the home of a "scary" individual who sold drugs and then they proceeded into the occupied house to complete the robbery after the shooting. (See *People v. Mora* (1995) 39 Cal.App.4th 607, 617 [the defendant had to be aware of risk of resistance to armed home invasion]; cf. *Clark*, *supra*, 63 Cal.4th at pp. 620–621 [robbery was planned for after closing time so period of interaction between perpetrators and victims was designed to be limited].)

With regard to efforts taken to minimize the risk of violence, this case is distinguishable from *Scoggins* and *Emanuel* in this regard. *Scoggins* and *Emanuel* involved felonies that were planned to take place in public spaces during daylight hours, providing circumstantial evidence the felonies were planned in ways that minimized the risk of violence. (See *Emanuel*, *supra*, 17 Cal.5th at p. 895 ["no evidence Emanuel planned anything other than a strong-arm daylight robbery in a public park"]; *Scoggins*, *supra*, 9 Cal.5th at p. 683 [concluding this factor did not weigh in favor of reckless indifference to human life finding, noting "Scoggins agreed to have the confrontation

37.

take place in a public parking lot during the daytime, when the possible presence of witnesses might reasonably be thought to keep his accomplices within the bounds of the plan"].) Additionally, there was no evidence in either *Emanuel* or *Scoggins* that the planned felonies in those cases involved the use of weapons. (See *Emanuel*, *supra*, 17 Cal.5th at p. 887 ["the trial court found the record does not contain evidence that Emanuel planned a robbery involving the use of weapons"]; *Scoggins*, *supra*, 9 Cal.5th at p. 683 [" 'The record does not contain any indication the defendant planned a beating involving the use of weapons. This fact is, by itself, a significant step towards minimizing the likelihood that the plan would result in a "grave risk of death." ' "].)

In contrast, here, there was evidence defendant helped plan an armed home invasion robbery of a drug dealer at night, providing " 'insight into both the magnitude of the objective risk of lethal violence' posed by the planned crime and [defendant's] 'subjective awareness of that risk.' " (*Emanuel*, *supra*, 17 Cal.5th at p. 889.) That is, the particular circumstances of the planned robbery supported a finding that the objective risk of violence posed by the crime and reasonably anticipated by defendant was graver than the risk of violence inherent in any felony. (See *ibid.* ["Where a defendant plans to commit an armed home invasion robbery at 3:00 a.m., with knowledge of several armed occupants and a methamphetamine operation within, for example [citation], a trier of fact might reasonably conclude that the objective risk of violence posed by the crime and reasonably anticipated by the perpetrator is graver than the risk of violence inherent in any violent felony."].)

Next, though defendant denied being present at the door when Ford issued the fatal shot, there was evidence from which the court could conclude defendant was nearby and he entered the house right after, he saw the victim lying on the floor, and he proceeded to take item(s) from the house. (See *Emanuel*, *supra*, 17 Cal.5th at p. 893 ["We have recognized that a defendant's conduct following the use of lethal force may be reflective of his or her mental state"].) He did nothing to aid Flinders or anyone else in

the house.  (See *Clark*, *supra*, 63 Cal.4th at p. 619 [a defendant's "failure to provide aid while present at the scene" may be relevant].)  Instead, there was evidence from which a reasonable fact finder could conclude defendant saw Flinders lying on the ground when he walked into the house—at which point he was well aware of the potential for additional violence—and he proceeded to participate in the robbery anyway.  He helped his cohort complete the robbery and escape after the shooting occurred.  (See *People v. Douglas*, *supra*, 56 Cal.App.5th at pp. 4–10 [no evidence shooting came as a surprise and, after seeing store clerk " 'on the floor shaking' " from a gunshot wound, the defendant " 'went outside to look around,' " returned to the store, stole money from the cash register, "then emptied [the clerk's] pockets while the clerk lay on the ground with blood pooling around his head"]; *People v. Medina* (2016) 245 Cal.App.4th 778, 792 [that the defendant "helped [his cohort] escape and had no concern for the shooting victim" supported special circumstance finding]; *People v. Bustos* (1994) 23 Cal.App.4th 1747, 1754 [that "[the defendant] fled together with his accomplices and the robbery loot, leaving the victim to die" evidenced he was a major participant who acted with reckless indifference to human life]; accord, *Tison*, *supra*, 481 U.S. at pp. 151–152 [the defendants acted with reckless indifference to human life by making no attempt to assist victims before, during, or after shooting, but instead choosing to assist killers in their continuing criminal endeavors]; cf. *In re Ramirez*, *supra*, 32 Cal.App.5th at pp. 405–406 [no evidence of petitioner's conduct from which it could be inferred he harbored a willingness to kill or anticipated the potential for loss of human life beyond that accompanying an armed robbery].)  When back at the Pomas' house, defendant proceeded to rifle through S.P.'s purse with Sharon.  While defendant arguably had no meaningful opportunity to aid Flinders right before the shooting, his role in planning the circumstances of the crime and his conduct after the shooting, namely his "action and inaction[,] showed indifference," supporting the trial court's finding with regard to defendant's state of mind at the time of the underlying felony.  (*People v. Mitchell* (2022)

39.

81 Cal.App.5th 575, 594; see *Emanuel, supra,* 17 Cal.5th at p. 895 ["that the defendant was generally indifferent to the fact that someone *has been* killed" may be evidence that, "at the time of the shooting, the defendant acted with indifference toward the grave risk that someone *could be* killed"].) Thus, here, defendant's actions after Ford shot the victim are relevant to the reckless indifference analysis in this case. (See *Scoggins, supra,* 9 Cal.5th at p. 679 ["A defendant's actions after the shooting may also bear on the defendant's mental state"].) This is not a situation in which "different inferences may be drawn from the circumstances" such that defendant's actions after the shooting "may not be very probative of his mental state." (*Ibid.*) Rather, the trial court could reasonably have interpreted defendant's actions after the shooting as indicative of his mental state.

It is true the California Supreme Court has held participation in an armed robbery and subjective awareness of "the risk of death inherent in an[y] armed crime is insufficient" on its own to establish a defendant acted with reckless indifference to human life. (*Banks, supra,* 61 Cal.4th at p. 792.) But, here, viewing the totality of the evidence in the light most favorable to the trial court's judgment, we conclude evidence of the specific circumstances of the offense paired with defendant's conduct—including evidence he was integral in planning the nighttime armed robbery of an individual who sold drugs, he instigated use of the gun, he drove the group to and from the robbery, and he continued to participate in the robbery after seeing the victim had been shot—provide substantial evidence to support the trial court's conclusion defendant acted with reckless indifference to human life. Said differently, we conclude sufficient evidence supports the trial court's finding that defendant was "aware of and willingly involved in the violent manner in which the particular offense [was] committed." (*Banks, supra,* at p. 801.) Accordingly, we conclude the record sufficiently supports the trial court's conclusion defendant acted with reckless indifference to human life.

**III. Court Did Not Prejudicially Err in Considering Parole Hearing Transcripts at Hearing**

Defendant next argues the court prejudicially erred in admitting the parole hearing transcripts at the evidentiary hearing. He argues his statements therein should be granted use immunity and they were not voluntary. Relatedly, he asserts *People v. Myles* (2021) 69 Cal.App.5th 688 (*Myles*) was wrongly decided. We reject defendant's contentions.

**A. Standard of Review and Applicable Law**

In *Myles*, *supra*, 69 Cal.App.5th 688, the First Appellate District, Division One, rejected a defendant's challenge to the admission of a parole hearing transcript and parole risk assessment at the evidentiary hearing on her petition for resentencing based on the passage of Senate Bill No. 1437. (*Myles*, at pp. 697–706.) Initially, the *Myles* court concluded the defendant had forfeited her challenges to the evidence by failing to object below. (*Id*. at pp. 696–697.) The *Myles* court held, irrespective, the proffered evidence was "new or additional evidence" permitted by section 1172.6 (former § 1170.95) and it was not inadmissible under *People v. Trujillo* (2006) 40 Cal.4th 165. (*Myles*, *supra*, at pp. 698–704.) As to the latter issue, the *Myles* court explained, in *Trujillo*, the California Supreme Court rejected the trial court's consideration of an admission by the defendant in a probation report in determining whether the defendant's prior conviction qualified as a strike. (*Myles*, at p. 703.) The *Myles* court distinguished *Trujillo* on the ground "the probation report at issue [there] potentially would have been used to increase the defendant's punishment"; whereas, "the prosecution in [*Myles*] was not using [defendant's] postconviction admissions to ' "convict" ' her, but to prove her ineligibility for a sentence reduction based on changes in the law under a retroactive statutory resentencing procedure." (*Myles*, at pp. 703, 704.) The *Myles* court explained further, "in determining whether a prior conviction qualifies as a strike—the issue under consideration in *Trujillo*—the court is limited to considering the record of conviction" to prevent relitigating the circumstances of the crime, which would threaten the defendant

41.

with harm akin to double jeopardy and denial of a speedy trial. (*Myles*, at p. 704.) However, in a section 1172.6 evidentiary hearing, "the trial court is *not* limited to the record of conviction—rather, . . . the parties may present 'new or additional evidence.' " (*Myles*, at p. 704.) And "double jeopardy principles are not at stake because defendant is voluntarily seeking to vacate her prior conviction, not subjecting herself to a new trial or the possibility of increased punishment." (*Ibid.*; see *People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 589.)

The *Myles* court also rejected the contention defendant raises here: that statements and testimony in connection with suitability for parole should be given "use immunity" pursuant to *People v. Coleman* (1975) 13 Cal.3d 867, 889. (*Myles*, *supra*, 69 Cal.App.5th at pp. 704–705.) In *Coleman*, the defendant argued "he was forced to forego his opportunity to testify in his own behalf at his [probation] revocation hearing in order to avoid incriminating himself at his pending trial." (*Coleman*, *supra*, 13 Cal.3d at p. 871.) The *Coleman* court acknowledged forcing a probationer to choose between the privilege against self-incrimination and the opportunity to be heard at his revocation hearing undermines two policies underlying the privilege. (*Id.* at pp. 876–878.) The *Coleman* court explained "the privilege against self-incrimination requires the prosecution in a criminal trial to produce sufficient evidence to establish the defendant's guilt *before* he must decide whether to remain silent or to testify in his own behalf." (*Id.* at p. 875.) But the prosecution's heavy burden to prove a defendant's guilt "may be substantially lightened if the prosecution is allowed to take advantage of the defendant's testimony at a prior probation revocation hearing." (*Id.* at p. 876.) Additionally, "when an alleged probation violation also constitutes a criminal offense for which the probationer might subsequently be prosecuted, he may be presented with the 'cruel trilemma' of self-accusation, perjury or injurious silence." (*Id.* at p. 878.) To resolve the tension between competing rights, the California Supreme Court "declare[d] as a judicial rule of evidence," upon timely objection, a probationer's testimony at a probation hearing held

prior to the disposition of criminal charges arising out of the alleged violation of the conditions of his probation, and any evidence derived from such testimony "is inadmissible against the probationer during subsequent proceedings on the related criminal charges, save for purposes of impeachment or rebuttal where the probationer's revocation hearing testimony or evidence derived therefrom and his testimony on direct examination at the criminal proceeding are so clearly inconsistent as to warrant the trial court's admission of the revocation hearing testimony or its fruits in order to reveal to the trier of fact the probability that the probationer has committed perjury at either the trial or the revocation hearing." (*Coleman*, *supra*, 13 Cal.3d at p. 889.) The intent of the rule "is to encourage the fullest possible *truthful* disclosure of relevant facts and circumstances at the revocation hearing by allowing a probationer who does testify at his revocation hearing nonetheless to enjoy unimpaired the full protection of the privilege against self-incrimination at his subsequent trial." (*Id.* at p. 892.)

In concluding *Coleman*'s holding did not extend to prevent use of the defendant's statements from a parole hearing at a section 1172.6 evidentiary hearing, the *Myles* court reasoned, "[b]ecause a sentence modification under section [1172.6] is an act of lenity and not a criminal trial, the wrongful admission of evidence does not implicate defendant's constitutional rights under the Fifth Amendment." (*Myles*, *supra*, 69 Cal.App.5th at p. 706; accord, *People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 588 [a petition under § 1172.6 "is the *opposite* of a criminal prosecution," "it can only help the defendant and can never hurt"].) The *Myles* court continued, "[The] defendant was not compelled to file a section [1172.6] petition, nor to testify at her parole hearing, nor to participate in her risk assessment interview." (*Myles*, *supra*, at p. 706.) And it was not "fundamentally unfair" to admit the defendant's testimony and statements from the parole proceedings during the resentencing proceeding, which was "voluntarily initiated by defendant bearing on some of the same issues." (*Ibid.*; accord, *People v. Mitchell*, *supra*, at p. 588 [agreeing with *Myles* that "extending judicially created use immunity to

petitioner-initiated collateral proceedings like these is inapt"]; but see *Mitchell*, at p. 604 (dis. opn. of Stratton, P. J.) [concluding "use of parole board statements as proof against a defendant at a former section 1170.95 evidentiary hearing unquestionably lessens the People's burden of proof" and "is fundamentally unfair"].)  Finally, the *Myles* court also held, even if the court erred in admitting the parole assessment report and transcript of the parole hearing, the error was harmless under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836; that is, it was not "reasonably probable defendant would have obtained a more favorable outcome had the evidence been excluded."  (*Myles*, at p. 706.)

## B.    Analysis

Citing *Coleman* in support, defendant argues his statements in the parole suitability hearings should be given use immunity such that they are inadmissible during the prosecution's case-in-chief in a section 1172.6 evidentiary hearing.  He urges us to agree with the dissent in *People v. Mitchell*, *supra*, 81 Cal.App.5th at page 604, that use of parole board statements at a section 1172.6 evidentiary hearing "lessens the People's burden of proof" and "is fundamentally unfair." (*Ibid*.)  He further argues his statements at the parole hearings should not be admissible to impeach the statement in his petition that he is qualified for resentencing under section 1172.6, as the court held in *People v. Duran* (2022) 84 Cal.App.5th 920, 931–932.  Defendant also asserts his rights to due process under the state and federal Constitutions barred admission of his parole hearing statements to the extent they functioned as involuntary confessions.  He argues the admission of his parole hearing statements was prejudicial under any standard of review. The People respond that defendant forfeited his contentions by failing to object to the parole hearing transcripts on the grounds his statements should be given use immunity and they were involuntary; rather, his counsel only objected conditionally on foundation grounds.  They also assert the court properly admitted them.  (Because defendant alternatively argues any forfeiture is attributable to his trial counsel's ineffective

assistance, we address defendant's claims on their merits and do not address his ineffective assistance claim or the People's forfeiture contention.)

First, we agree with the growing consensus of courts that conclude "use immunity" does not extend to bar the use of defendant's statements and testimony in connection with suitability for parole during a section 1172.6 evidentiary hearing. (See, e.g., *Myles*, *supra*, 69 Cal.App.5th at p. 706; *People v. Anderson* (2022) 78 Cal.App.5th 81, 93; *People v. Mitchell*, *supra*, 81 Cal.App.5th at pp. 588–590; *People v. Duran*, *supra*, 84 Cal.App.5th at p. 930.) In so concluding, we agree with our sister courts: "defendant has not demonstrated that the same principles and rationale underlying the judicially created exclusionary rule formulated in *Coleman* and applicable in criminal trials apply in [his] section [1172.6] resentencing hearing." (*Myles*, *supra*, at p. 706; see *People v. Anderson*, *supra*, at p. 93.) The proceedings at issue here—resulting from a defendant's voluntary initiation of a petition for resentencing in light of ameliorative legislation—are distinct from a criminal prosecution. (See *Mitchell*, *supra*, at p. 588 ["A petition under former section 1170.95 is not a criminal prosecution. [Citation.] It is the *opposite* of a criminal prosecution. A criminal prosecution can only hurt a defendant and can never help. The process here is the reverse: it can only help the defendant and can never hurt"].) And "the use of a defendant's statements at a subsequent section 1172.6 evidentiary hearing does not implicate the privilege against self-incrimination." (*People v. Duran*, *supra*, at p. 930.) Rather, "[o]nce a defendant's 'sentence has been fixed and the judgment of conviction has become final,' the 'general rule' is that 'there can be no further incrimination' and hence 'no basis for the assertion of the privilege.' " (*Ibid.*; accord, *Mitchell v. United States* (1999) 526 U.S. 316, 326; but see *Lambright v. Ryan* (9th Cir. 2012) 698 F.3d 808, 823–824 [statements made by the defendant during collateral review were protected by 5th Amend. and could not be used at subsequent resentencing to establish aggravating factors or undermine claim of mitigating factors].) During the evidentiary hearing, a defendant's final judgment of conviction is still intact,

which is why "the panoply of rights that attach at trial do *not* apply during a section 1172.6 evidentiary hearing, such as the right to a jury trial or the protection against double jeopardy." (*People v. Duran*, *supra*, at p. 931.) "As a result, use of a defendant's prior statements during such an evidentiary hearing does not implicate the privilege against self-incrimination, and *Coleman*'s core rationale—and hence its holding—is not implicated." (*Ibid*.; accord, *People v. Anderson*, *supra*, at p. 93.) Additionally, as the *Myles* court observed, defendant was not compelled to file a section 1172.6 petition for resentencing nor to testify at his parole hearing. (*Myles*, *supra*, 69 Cal.App.5th at p. 706.) And defendant was "expressly advised at [his] parole hearing that [he] had the option to not discuss the commitment offense and that choice would not be held against [him]. Defendant opted instead to discuss it and testified under oath about [his] role in the crime. Having chosen to . . . testify truthfully at the parole hearing, it is not fundamentally unfair to admit that information during a resentencing proceeding voluntarily initiated by defendant bearing on some of the same issues." (*Ibid*.)

To the extent defendant now contends his statements at the parole hearing were involuntary because they were coerced, he did not object on this basis below and thus has forfeited this argument. (See Evid. Code, § 353.) Irrespective, his claim fails. " 'A statement is involuntary if it is not the product of " 'a rational intellect and free will.' " ' [Citation.] The test for determining whether a confession is voluntary is whether the defendant's will was overborne at the time he confessed." [Citation.] " 'The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were "such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." [Citation.]' [Citation.] In determining whether or not an accused's will was overborne, 'an examination must be made of "all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." ' " ' " (*People v. McWhorter* (2009) 47 Cal.4th 318,

346–347.) " 'A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions.' " (*Id*. at p. 347.)

Here, contrary to defendant's assertions, there is no basis in the record from which to conclude defendant's statements at the parole hearings were involuntary. There is no evidence defendant's statements were induced by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. To the contrary, the parole hearing transcripts reflect defendant was represented by counsel and he was expressly advised during the hearings that he was not required to testify. (See *Myles*, *supra*, 69 Cal.App.5th at p. 706 [the defendant was "expressly advised at [his] parole hearing that [he] had the option to not discuss the commitment offense and that choice would not be held against [him]. Defendant opted instead to discuss it and testified under oath about [his] role in the crime. Having chosen to . . . testify truthfully at the parole hearing, it is not fundamentally unfair to admit that information during a resentencing proceeding voluntarily initiated by defendant bearing on some of the same issues"].) And we cannot conclude the mere fact the statements were made in a parole hearing renders them involuntary. Thus, we reject defendant's contentions.

## DISPOSITION

The court's order denying defendant's section 1172.6 petition for resentencing is affirmed.